IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | |
|---|---|
| **LEONARD ROWE,** | ) |
| **Plaintiff,** | ) |
| v. | ) CIVIL ACTION NO. 2:15-02014 |
| **CAROLYN W. COLVIN,**<br>**Acting Commissioner of Social Security,** | ) |
| **Defendant.** | ) |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the Court on Plaintiff's Motion for Summary Judgment (Document No. 12.) and Defendant's Motion for Judgment on the Pleadings. (Document No. 18.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 14 and 15.)

The Plaintiff, Leonard Rowe (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on January 24, 2012, and May 22, 2012 (protective filing date), respectively, alleging disability as of January 1, 1997,[1] due to "arthritis, knees, gout, [and] hand swelling."[2] (Tr. at 17, 177-83, 184-92, 204, 217.) The claims were denied initially and upon reconsideration. (Tr. at 10,

---

[1] Claimant amended his alleged onset date to May 31, 2011. (Tr. at 17, 33.)

[2] The Notices of Reconsideration indicate that Claimant also alleged a concussion and dizzy spells as additional disabling conditions. (Tr. at 121, 124.) On his form Disability Report – Appeal, dated October 3, 2012, Claimant alleged that his swelling had worsened and that he experienced increased pain and restriction of movement of his joints, especially his back and hip. (Tr. at 243.)

69-77, 78-86, 87-88, 89-98, 99-108, 109-10, 121-23, 124-26.) On December 31, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 127-28.) The hearing was held on January 8, 2014, before the Honorable Peter Jung. (Tr. at 29-68.) By decision dated January 28, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 17-28.) The ALJ's decision became the final decision of the Commissioner on December 20, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On February 20, 2015, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2014). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§

2

404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2014). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

   appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
    (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
    (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). [3] Fourth, if the claimant's

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2014).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since May 31, 2011, the amended alleged onset date. (Tr. at 19, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "osteoarthritis, degenerative joint disease, gout, and obesity," which were severe impairments. (Tr. at 19, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity to perform light exertional level work, as follows:

5

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds. He could stand and walk six hours and sit six hours in an eight-hour workday. He would be able to push and pull less than twenty pounds with the upper and lower extremities. He should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, such as machinery and heights, etc.

(Tr. at 22, Finding No. 5.) At step four, the ALJ found that Claimant was able to perform his past relevant work as a mall sweeper. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ further concluded that Claimant could perform jobs such as a cafeteria attendant, cashier, and stock checker, at the unskilled, light level of exertion. (Tr. at 26-27, Finding No. 10.) On these bases, benefits were denied. (Tr. at 28, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

Claimant was born on November 5, 1959, and was 54 years old at the time of the administrative hearing, January 8, 2014. (Tr. at 26, 34, 177, 184.) Claimant had an eleventh grade, or limited education and was able to communicate in English. (Tr. at 26, 34, 216-17.). Claimant had past relevant work as a mall sweeper, an ambulance attendant, a truck driver helper, and an acting building super. (Tr. at 26, 56-58, 218, 224-31.)

The Medical Record.

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.[4]

On April 14, 2011, Claimant's treating physician, Dr. Riaz Rahman, M.D., noted Claimant's complaint of arm pain and sent him for a neurological consult.[5] (Tr. at 340-41, 524-25.) Claimant was examined by Dr. Andrew Faskowitz, D.O., who diagnosed post herpetic neuralgia that resulted from a flu shot. (Tr. at 343-45, 527-29.)

On September 19, 2012, Dr. Nilima Bhirud, M.D., conducted a consultative evaluation at the request of the State Disability Determination Service. (Tr. at 402-08.) Claimant reported a history of arthritis, knee problems, and gout, which affected his feet, knees, elbows, and hands. (Tr. at 402.) He reported attacks from gout once a week that lasted four to five days, for which he took Indocin. (Id.) He also took Allopurinol daily for arthritis. (Id.) Claimant reported a history of morning stiffness and pain in the joints of the bilateral hands that was made worse by lifting weights. (Tr. at 403.) He stated

---

[4] Claimant alleges error only respecting his mental impairments. The Court therefore, limits the summary of the evidence to that related to Claimant's mental impairments.

[5] It was noted on December 16, 2010, that Claimant had a history of left forearm surgery and a right wrist fracture. (Tr. at 328, 540.)

7

that he fractured his right wrist 27 years ago, which resulted in surgery. (Id.) He reported constant throbbing and increased pain with cold temperatures of the right wrist. (Id.) He further reported that he could lift twenty pounds in the right hand and that he had pain in the bilateral shoulder that was made worse by lifting his arms overhead. (Id.)

Physical examination of Claimant's hands revealed swelling of the IP and MCP joints, mild tenderness, good grip, and an ability to pick up a coin from the table with either hand. (Tr. at 404.) Examination of the wrists revealed tenderness and a bony presence on the medial side, with decreased range of right wrist motion, and no swelling or tenderness of the left wrist or shoulders. (Id.) Dr. Bhirud noted that there was no evidence of gout in Claimant's joints. (Id.)

On September 24, 2012, Claimant established himself as a patient with Dr. Lester Labus, M.D., for complaints of constant burning of the arm, with a one to two week history, and bilateral elbow pain. (Tr. at 409-11, 656-58.) Dr. Labus noted on physical examination that Claimant had swelling of both MCP I joints of the hands, with swelling of the tenosynovial compartments and dorsal aspect of the left wrist. (Tr. at 410, 657.) Dr. Labus gave a working diagnosis of rheumatoid arthritis, noting that he likely had something other than gout, and continued Claimant on Naproxen and prescribed Prednisone. (Tr. at 410-11, 657-58.)

On September 28, 2012, Dr. Fulvio Franyutti, M.D., a State agency reviewing medical consultant, assessed Claimant's RFC, and concluded that Claimant was capable of performing light exertional level work, with no manipulative limitations. (Tr. at 72-77.) Dr. Franyutti opined that Claimant should avoid concentrated exposure to temperature extremes and vibration and moderate exposure to hazards. (Tr. at 74-75.)

Claimant returned to Dr. Labus on October 24, 2012, and reported that his wrist was worse with increased swelling. (Tr. at 653.) Dr. Labus diagnosed tenosynovitis of the left hand and wrist. (Tr.

at 654.) On November 16, 2012, Claimant complained of pain and swelling of the joints in his hands. (Tr. at 651.) On physical examination, Dr. Labus observed swelling of the bilateral MCP II and III joints. (Tr. at 652.) He assessed possible rheumatoid arthritis. (Id.)

X-rays of Claimant's right hand on November 16, 2012, revealed osteopenic bones with deformity of the right distal radius and shortening of the radius, that was consistent with an old fracture. (Tr. at 517.) Degenerative changes were noted at the carpometacarpal joints with joint space narrowing, sclerosis, and osteophyte formation. (Id.) Some joint space narrowing of the second and third metacarpophalangeal joints and the interphalangeal joints, also were noted. The x-rays of the left hand demonstrated mild joint space narrowing, with some soft tissue swelling at the left wrist and distal forearm. (Id.)

On December 26, 2012, Dr. Rabah Boukhemis, M.D., a State agency reviewing medical consultant opined that Claimant was capable of performing light exertional level work, with no manipulative limitations and the same environmental limitations assessed by Dr. Franyutti. (Tr. at 94-96, 102-07.)

On January 22, 2013, Claimant continued to complain of hand pain and stiffness that was worse with cold weather. (Tr. at 648.) Dr. Labus again noted swelling of the hands and diagnosed osteoarthritis of the hands. (Tr. at 649.) On May 6, 2013, Dr. Labus referred Claimant for physical therapy related to his back complaints. (Tr. at 647.) Claimant underwent physical therapy for his back complaints in May 2013, and reported on May 16, 2013, that he experienced occasional tingling in the bilateral hands. (Tr. at 468.)

On June 21, 2013, Claimant presented to the emergency department at St. Francis Hospital with complaints of hand and wrist injuries from a fall, with deformity. (Tr. at 436, 438.) Claimant fell out of the vehicle as he was going to the hospital for evaluation of right lower extremity pain. (Tr. at

9

444, 446.) It was noted that he had limited left wrist and hand motion, with swelling and an abrasion. (Id.) The x-rays of Claimant's right hand and wrist revealed a comminuted distal radial fracture with intraarticular extension, with ulnar plus variance present, of the right hand. (Tr. at 448, 459-60.) Multifocal degenerative osteoarthritis was noted along the wrist with diffuse osteopenia and soft tissue swelling of the wrist. (Id.) Claimant therefore, was diagnosed with a radius fracture of the right wrist and a distal radius fracture of the right hand, with severe arthritis. (Tr. at 455.) His right forearm was placed in a splint and he was discharged home in good condition, with a prescription for Norco. (Tr. at 456-57.)

     Claimant was examined by Dr. Clark D. Adkins, M.D., on June 27, 2013, for complaints of right arm and wrist pain following an injury from a fall. (Tr. at 616-17.) Dr. Adkins noted on examination that Claimant had a clear deformity of his wrist, with some mild crepitation, but no tenderness about the elbow. (Tr. at 616.) Dr. Adkins diagnosed a fracture of the distal radius/ulna and malunion of fracture. (Id.) Claimant was placed in a splint. (Id.) On July 3, 2013, Claimant's splint was removed and he was placed in a short-arm cast. (Tr. at 618.) On July 15, 2013, Claimant reported that he was doing well and Dr. Adkins confirmed that Claimant had a malunion of the fracture but that the current fracture was not displaced. (Tr. at 620.) Dr. Adkins noted on August 8, 2013, that Claimant had an obvious deformity of his wrist, that his ulnar styloid was somewhat prominent, and that he moved his elbow, fingers, wrist, and hand well. (Tr. at 622.) Dr. Adkins opined that Claimant "may do better in the long-run with an osteotomy," which would be planned after the fractures had healed. (Tr. at 622.) Claimant was placed in a canvas wrist support. (Id.) On September 9, 2013, Claimant reported that he had been wearing his brace and Dr. Adkins noted that overall, his function was improving, though he reported pain in his elbow. (Tr. at 624, 633.) Physical examination revealed tenderness of the wrist and elbow and an absence of crepitation or tenderness over the ulnar nerve. (Id.) The x-rays

of Claimant's elbow revealed no obvious bony injury, but a bit of arthritis with some spurring of the coronoid process. (Id.) X-rays of Claimant's wrist revealed that the fracture had healed. (Id.) Dr. Adkins explained to Claimant that he had a malunited wrist fracture. (Id.) He noted that Claimant had two fractures and that the initial fracture was malunited and that the newer fracture was displaced minimally, although Claimant had increasing pain. (Id.) An osteotomy of Claimant's wrist was scheduled to attempt to add some length to his wrist. (Tr. at 624-25, 633-34.)

On November 7, 2013, Dr. Labus noted Claimant's continued complaints of pain and stiffness and noted that he had not had the surgery as planned. (Tr. at 627, 630.) Claimant reported that he was able to lift 30 pounds occasionally and less than 20 pounds frequently. (Id.) He also indicated that he could carry less than 20 pounds occasionally. (Id.) Claimant reported that he was able to perform simple grasping with the left hand regularly but only for a short period of time with the right hand due to the recent injury. (Id.) Dr. Labus diagnosed generalized osteoarthrosis of multiple sites and opined that Claimant should avoid moving machinery; temperature and humidity changes, with mild restriction; and dust, fumes, and gases, with mild restriction. (Tr. at 629, 632.) He further opined that Claimant was unable to drive automotive equipment and that due to his pain and stiffness, he required frequent breaks at least every two hours. (Id.)

On November 11, 2013, Dr. Labus completed a form Medical Source Statement Physical, on which he noted that Claimant was diagnosed with generalized osteoarthrosis of the hands and fracture of the right ulna/radius. (Tr. at 728-31.) Claimant's symptoms included pain and stiffness of the right wrist and elbow and pain and stiffness of the bilateral hands and fingers. (Tr. at 728.) He assessed Claimant's prognosis as fair. (Id.) Dr. Labus opined that Claimant's symptoms often interfered with the ability and attention required to perform simple, work-related tasks. (Id.) He opined that Claimant was capable of sitting for eight hours in an eight-hour workday and that he had limitations in

11

performing repetitive reaching, handling, or fingering. (Tr. at 728-29.) Dr. Labus failed to complete the portion of the form that asked for the percentage of the day that Claimant was capable of using his hands, fingers, and arms for simple grasping, pushing and pulling, and fine manipulation. (Tr. at 729.) When asked for remarks on Claimant's limitations, Dr. Labus responded: "[S]ee Attached office notes." (Tr. at 731.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing his RFC when he failed to account for Claimant's well-documented limitations in reaching, handling, and fingering. (Document No. 13 at 4-10.) Specifically, Claimant asserts that his testimony, which was confirmed by Dr. Labus and the other objective evidence of record, established significant hand use limitations. (Id. at 4.) Claimant notes that x-rays of the right hand in June 2013, revealed degenerative osteoarthritis of the right hand and wrist, which was confirmed by Dr. Labus, who acknowledged his complaints of pain and stiffness of the right hand, wrist, and elbow. (Id.) He notes that Dr. Labus provided specialty treatment and noted that the problem would only be corrected by surgery. (Id. at 5.) Claimant notes that Dr. Labus's records reflected clinical findings of pain, swelling, and stiffness. (Id.) He also notes that he underwent physical therapy in 2013. (Id. at 5-6.)

Claimant asserts that the ALJ erred in failing to explain why his RFC did not include any hand use limitations. (Id. at 7.) Claimant asserts that the ALJ failed to discuss any hand use limitations, other than to report the underlying evidence that supported such limitations. (Id.) Claimant contends that the ALJ's failure is not harmless because his past work that the ALJ found him able to perform, as well as the three alternate jobs described by the VE, require frequent reaching and handling. (Id. at 8.) Accordingly, Claimant contends that the ALJ's errors require remand. (Id. at 8-10.)

12

In response, the Commissioner contends that substantial evidence supports the ALJ's finding that Claimant could perform the limited range of light work identified by the VE. (Document No. 18 at 7-10.) The Commissioner asserts that Dr. Adkins, Claimant's treating physician, never placed any work-related restrictions on him due to his intermittent hand and wrist complaints. (Id. at 8.) Dr. Bhirud noted on examination that Claimant was able to pick up a coin from the table with either hand and pick up a pen from the floor, and that he had good grip. (Id.) Furthermore, the state agency reviewing medical consultants opined that Claimant did not have any work-related manipulative limitations. (Id.) The Commissioner notes that Claimant even testified that he had left hand difficulty only once in a while and could lift 40 pounds, despite having stated that he was unable to grab and hold things due to right hand pain. (Id. at 9.) The Commissioner asserts that the ALJ amply accounted for Claimant's hand and wrist complaints in the assessed RFC, which was consistent with the evidence of record and the VE's testimony. (Id.)

The Commissioner also contends that the ALJ was not required to give any significant weight to Dr. Labus's opinion because he failed to set forth any specific limitations related to Claimant's hands and wrists. (Id.) The Commissioner again notes that Dr. Adkins did not assess any limitations and noted in August 2013, that Claimant was able to move his fingers, wrists, hand, and elbow well. (Id. at 9-10.) Accordingly, the Commissioner contends that the ALJ's decision is supported by the substantial evidence of record. (Id. at 10.)

Analysis.

Claimant alleges that the ALJ failed to account for limitations in reaching, handling, and fingering when he assessed Claimant's RFC. (Document No. 13 at 4-10.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment

13

"must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2014). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2014).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

14

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2014). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

As stated above, the ALJ concluded that Claimant was capable of performing light exertional level work, which consisted of lifting and carrying twenty pounds occasionally and ten

15

pounds frequently. (Tr. at 22.) The ALJ assessed postural limitations and found that Claimant must avoid concentrated exposure to temperature extremes, vibration, and hazards. (Id.) In assessing Claimant's RFC, the ALJ acknowledged Claimant's testimony that the primary conditions that prevented him from working were his gout, arthritis, and inability to move his hands. (Tr. at 23, 46.) Claimant denied pain in his left hand and testified that he was unable to grab items with his right hand like use to. (Tr. at 51.) He reported that he sometimes had difficulty holding objects and often dropped items. (Id.) He testified that he experienced problems with his left hand "once in a while." (Id.) Claimant testified that his wrists, elbows, and ankles locked up and were painful. (Tr. at 46.) He stated that he could lift 40 pounds and had no difficulty lifting a gallon of milk. (Tr. at 23, 51-52.)

The ALJ found that Claimant's medically determinable impairments, including the osteoarthritis of the hands and wrists, reasonably were expected to cause Claimant's alleged symptoms, but that Claimant's allegations were not entirely credible. (Tr. at 23.) The ALJ noted Dr. Bhirud's notes of mild tenderness and swelling of both hands in September 2012, as well as bony prominence on the medial side of the right wrist, with tenderness and decreased range of motion. (Tr. at 23.) Nevertheless, Claimant had good grip. (Id.) The December 2012, x-rays of the left hand were negative. (Id.) In June 2013, x-rays demonstrated a fracture and degenerative osteoarthritis. (Id.) The ALJ also acknowledged Claimant's reported activities, which were limited. (Tr. at 24-25.) The ALJ gave great weight to the opinions of the State agency reviewing medical consultants because their opinions were "balanced, objective, and consistent with the evidence of record as a whole." (Tr. at 25.) The ALJ gave little weight to Dr. Labus's opinion, except that he included the environmental limitations in his RFC. (Id.) The ALJ concluded that Dr. Labus's frequent break restrictions were unsupported by Dr. Labus's examination notes. (Id.) The ALJ

noted that despite Dr. Labus's assessed limitations in reaching, handling, and fingering, he failed to indicate the limitations in reference to an eight-hour workday. (Id.)

Claimant alleges that the documented pain, stiffness, and swelling of his right hand, wrist, and elbow affected his ability to reach, handle, and finger. (Document No. 13 at 4.) Despite the clinical findings from Claimant's treating physician, the record is void of any assessed limitations. In fact, Dr. Bhirud noted in September 2012, that Claimant had good grip and was able to pick up a coin from the table with either hand. Furthermore, Dr. Adkins noted in August 2013, that Claimant was able to move his fingers, hands, wrists, and elbow well. None of Claimant's treating providers placed in work-related limitations on Claimant due to his complaints of his fingers, hands, wrists, or elbows. The two State agency reviewing medical consultants did not assess any manipulative limitations. Claimant testified that he was able to lift 40 pounds and that he had problems with his left hand only once in a while. Although Dr. Labus opined that Claimant had limitations in performing repetitive reaching, handling, or fingering, he failed to set forth any specific limitation or identify the percentage of the day that he was capable of performing such functions. Furthermore, although Dr. Labus opined that Claimant had limitations in repetitive reaching, handling, or fingering, his treatment notes failed to substantiate such an opinion. Accordingly, the Court finds that the little weight assigned to Dr. Labus's opinion is supported by the substantial evidence of record.

Because the record failed to substantiate any limitations involving repetitive reaching, handling, or fingering, the ALJ was not required to include such limitations in a hypothetical question to the VE. To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989).

17

"[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983). The ALJ therefore, was entitled to rely upon the VE's testimony that Claimant could perform the alternative jobs of a cafeteria attendant, cashier, and stock checker, despite any reaching, fingering, or handling requirements.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Summary Judgment (Document No. 12.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 18.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

.	The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 28, 2016.

_____
Omar J. Aboulhosn
United States Magistrate Judge